John MENEFEE, et al., Appellants,

v.

James T. GUEHRING, et al., Appellees.

No. 01–82–0288–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 15, 1983.

Rehearing Denied Jan. 5, 1984.

John H. Holloway, Houston, for appellants.

John Marshall, Craig A. Washington, Melvin Lampley, Houston, for appellees.

Before EVANS, C.J., and BASS and DUGGAN, JJ.

## OPINION

EVANS, Chief Justice.

The plaintiff, John D. Menefee, individually and as next friend of his minor son, brought this medical malpractice suit against Dr. James Guehring and his medical group, Piney Point Pediatrics Associates, to recover damages for his son's allergic reaction to a medication, Phenobarbital, prescribed by the doctor. The plaintiffs contended that the doctor had been negligent (1) in not obtaining the plaintiffs' effective and informed consent to the drug therapy; (2) in initially prescribing the drug; and (3) in continuing the drug treatment after the allergic reaction developed. In response to special issues, the jury found that the minor plaintiff had sustained a reaction from the drug, but the jury did not find negligence on the part of the doctor under any of the three above mentioned theories. The trial court denied the plaintiffs' motions for judgment n.o.v. and for new trial, and entered a take nothing judgment against the plaintiffs.

In seventeen points of error, the plaintiffs contend that the trial court abused its discretion in submitting the charge to the jury, and that the jury's answers to certain special issues should be disregarded, either because the undisputed evidence established the doctor's negligence as a matter of law, or because the jury's findings to such issues were against the great weight and preponderance of the evidence. We overrule all points of error and affirm the trial court's judgment.

The minor plaintiff, John Menefee, was nine years old when he was first examined in 1974 by Dr. Guehring, a pediatric specialist. On three occasions prior to being examined by Dr. Guehring, the minor plaintiff had experienced symptoms of epileptic episodes. After the last episode he had been examined, but not treated, by a doctor in Conroe, where he lived. His mother then arranged to have John examined by a Dr. Tengg, at Piney Point Pediatric Associates. Because Dr. Tengg was unavailable, Dr. Guehring conducted the examination. Dr. Guehring advised John's mother that John appeared to be normal but that he wanted John hospitalized for diagnostic tests. He prescribed the drug Phenobarbital, an anti-seizure medication, and told John's mother to give John one capsule in the morning and two at bedtime.

Mrs. Menefee filled the prescription that same day, and proceeded to administer the drug to John as prescribed. A "week or so" later, she noticed that John had begun "to form very dark circles around his eyes and his eyes were discolored, and he had a

little rash on him." She testified that she then called Dr. Guehring but was unable to reach him and talked only to his nurse. She said that the nurse told her to continue the medication. On July 8, 1974 John was admitted to the hospital for some tests and was discharged two days later. Dr. Guehring testified that he examined John at the hospital and that his appearance, including his eyes, was normal. The hospital's records indicate that John was examined by Dr. Guehring and also by an intern during his first hospitalization, and that no rash was noted.

Mrs. Menefee testified that several days after John returned home, about July 12 or 13, she called Dr. Guehring on the telephone and was advised that "John was fine, that didn't anything show up on his tests." According to her testimony, she told the doctor that she was concerned about John's condition, that "he wasn't himself. He had these dark circles around his eyes and he had discolor in his eyes and he wasn't normal and it worried me." She said she asked Dr. Guehring whether John could be having problems from the tests that had been done, and he replied, "Oh, no, John just probably has a virus or something."

Mrs. Menefee testified that on Sunday evening, July 14, after John returned home from swimming, she noticed that his eyes were "blood red." "He had real dark circles around his eyes ..." and he had a temperature of 103 or 104 degrees. His rash was getting worse. "It looked like someone had taken a cigarette and dabbed him with it ..." He had blisters in his mouth. She said that early the next morning, July 15, she called Dr. Guehring's office and advised him of the problems. According to her testimony, Dr. Guehring told her that John probably just had a virus, and he prescribed some suppositories and cough medicine which she obtained at the drugstore. By late afternoon she "recognized that John was real sick," and she left a message at Dr. Guehring's office for him to call her. About 7:00 p.m. that evening she said she talked to Dr. Guehring and told him that "John was terribly ill," and

asked permission to take John to a hospital. She said that Dr. Guehring told her to bring John to his office first thing the following morning and advised her to call him or Dr. Tengg that night if matters got worse. Shortly before midnight she called Dr. Tengg, who, she said, stated that he did not know anything about the matter and advised her to get some popsicles to see if she could get John's fever down. She asked Dr. Tengg's permission to bring John in to see him at that time, but he said it would be better to bring John to the office the first thing in the morning. Mrs. Menefee and her husband took John to the doctor's office early the next morning, and he was immediately hospitalized. She said that Dr. Guehring did not ask a lot of questions, that he just told her John would have to go to the hospital immediately "because they didn't know what was wrong with him."

That same morning, July 16, John was admitted to the hospital a second time, and his condition was diagnosed as Stevens-Johnson syndrome. He was not released until three weeks later. During that period of time his eyes and the rash got much worse; he ran a very high fever; and he lost all his fingernails and toenails. Mrs. Menefee testified that several weeks after John was discharged from the hospital, she took him back to see Dr. Guehring. She said that Dr. Guehring said he was sorry about everything that had happened; that "he was sorry about the drug and everything, that it was his fault." When asked about what Dr. Guehring told her about his fault in connection with the drug, she replied, "Because he didn't tell me anything about the drug. I mean, John just took it." She said as a result of the Stevens-Johnson syndrome, that John continued to have skin problems; that he constantly had bad headaches; and that his eyes ran all the time so that he always had to have a handkerchief with him. She said that he also had mouth ulcers about once a month.

Dr. Guehring testified that when Mrs. Menefee first brought John to see him, she expressed "some unhappiness" with the

previous doctor's diagnosis and stated that she wished to obtain another opinion. He found nothing abnormal as a result of his physical examination of John, but based upon his examination and John's medical history, he formed a "working diagnosis" of "focal motor seizure." He was concerned that these seizures might increase in frequency and that because of John's inability to respond during such a seizure, it could be physically dangerous to him. He decided to have John hospitalized for a skull X-ray, an electroencephalogram (EEG), and other tests. He testified that there were two principal medications used to control such seizures, Phenobarbital and Dilantin, and that Phenobarbital was the least likely to cause serious side effects. He had used the drug before on many occasions and never had a patient who suffered an allergic reaction. He stated that it was not standard medical procedure for a pediatrician to warn that Stevens-Johnson syndrome or other severe allergic reactions could occur as a result of the use of the drug. He said it was "very unlikely that the drug treatment would result in Stevens-Johnson syndrome." According to Dr. Guehring's testimony, Stevens-Johnson syndrome is an allergic reaction that can be triggered by many kinds of drugs. Little blisters show up on the skin in places such as the corner of the lip and the eye, but high fever and ulcers inside the mouth, such as John developed, were not classic symptoms of the syndrome. He said that at the time he was treating John, there was an epidemic of herpes, i.e., cold sores, and when a bad case of herpes is developing, the children got ulcers in the mouth that looked exactly the same as the Stevens-Johnson blisters.

Dr. Guehring testified that Mrs. Menefee called him after hours on Monday, July 15 and complained that John was not getting any better and seemed to be getting worse. She said he was vomiting, not able to drink anything, and was having trouble swallowing. He said that was the first time she had made any complaint about John's condition. He said that there was nothing she told him which gave him reason to believe

that John's condition was other than herpes, and that he prescribed Thorazine suppositories for the vomiting and told Mrs. Menefee to come in the next morning if John was not doing better. He said that when he and Dr. Tengg examined John the next morning, they decided that John was having some sort of reaction. He denied that he had ever told Mrs. Menefee, "this is all my fault."

■ We first consider the plaintiffs' points of error relating to the claim that Dr. Guehring was negligent in failing to obtain their effective and informed consent to the drug therapy. In support of this theory, the plaintiffs contend that the evidence established the doctor's negligence as a matter of law (point one); that the court abused its discretion in refusing to submit their requested issue on informed consent (point two); in overruling their exceptions to the court's definition on informed consent (point three); in denying their motion for new trial because the uncontroverted evidence established the doctor's negligence as a matter of law (point sixteen); and that the jury's negative finding on the informed consent issue was against the great weight and preponderance of the evidence (point seventeen). The plaintiffs also contend that the court abused its discretion in overruling their exceptions to the court's predication of a proximate cause issue on the informed consent issue (point fourteen), and in overruling their objection to the court's instruction on the informed consent issue (point fifteen).

Mrs. Menefee testified that when Dr. Guehring first prescribed Phenobarbital, he told her he was going to treat John with the drug until he was able to get the tests made at the hospital. According to her testimony, Dr. Guehring did not tell her that there was any risk or danger from the drug; that he did not tell her it could be habit forming; that it could cause dizziness or a stupor; severe headaches; excessive nausea or vomiting; inability to breathe; depression; hypersensitivity of the eyes to light; that it could produce a rash or skin

eruption; or, in general, that it could cause a severe allergic reaction such as Stevens-Johnson syndrome. She said if he had told her about these possibilities, she would have known what to look for in John and could have reported the symptoms to the doctor.

Dr. Guehring, on the other hand, testified that he did sufficiently advise Mrs. Menefee of the risks to her child when he prescribed the drug. According to his testimony, he told Mrs. Menefee that she should watch for any change in the child's mental attitude, and that if the drug had that effect, the child would become quieter and sleepier, and would have difficulty functioning through the day. He said he also advised her to watch for any increased (or decreased) activity in the child and to look for other allergic reactions such as rashes. He said he told her that he intended to give the child the drug up until the time of the child's hospitalization for the tests.

The plaintiffs offered the medical testimony of Dr. Martha D. Yow, Professor and Department Chairman at Baylor College of Medicine. Dr. Yow testified that Phenobarbital was "a very commonly prescribed drug. It is one of the safest drugs that we use for sedation of children, ... that rarely patients have side effects, such as somnolence, lethargy, and occasionally rashes." Dr. Yow said she felt that patients should be advised of such side effects but that she did not think that should be overemphasized. She testified that Stevens-Johnson syndrome was a very unusual result of drug therapy and that there was no way, before giving a particular drug to a patient, to determine whether the patient would have an allergic reaction such as Stevens-Johnson syndrome. She said it was not standard medical practice in 1974 for pediatricians prescribing Phenobarbital to warn a minor patient's parents that Stevens-Johnson syndrome or some similar, severe allergic reaction could occur.

The defendants offered the medical testimony of Dr. Jerry H. Stephens, a dermatologist and clinical assistant professor of dermatology at the University of Texas, and a clinical associate professor at Baylor College of Medicine. Dr. Stephens had dealt with Stevens-Johnson syndrome on a number of occasions. He said the condition could be a reaction to medication or it could be a viral condition. He said it was very uncommon for the syndrome to be a side effect or by-product of a drug. He said that it was not customary for physicians prescribing medication such as Phenobarbital to warn a minor patient's mother that Stevens-Johnson syndrome could result from taking the drug, and that as far as the risk of Stevens-Johnson syndrome, the drug was "very safe." He said, on cross-examination, that the two most important things to look for as side effects of Phenobarbital were drowsiness and lethargy. He said that when prescribing drugs for a child, he would tell the child's parents only that the drug might cause side effects, and that if any problem developed, such as headaches, nausea or anything else they did not expect, they should report the matter to him.

The plaintiffs contend that the uncontroverted evidence established the absence of informed consent as a matter of law. This contention is based principally upon Mrs. Menefee's testimony, and upon certain testimony of Dr. Guehring with respect to his prior deposition testimony. We quote from the plaintiffs' brief, which contains an excerpt of Dr. Guehring's testimony:

The uncontroverted evidence established, as a matter of law, that Dr. Guehring did not advise Mrs. Menefee of the "Stevens-Johnson" syndrome associated with Phenobarbital:

"Q. What warnings did you give the mother concerning the use of this particular drug?

A. I didn't give her any warnings.

\* \* \* \* \* \*

Q. What specific warnings did you give to the mother of this child about the use of this drug until you saw him again? (After being advised of the child's reactions).

A. I didn't give her any specific warnings other than they could make him sleepy at first."

In effect, the plaintiffs argue that Dr. Guehring's testimony must be construed as an admission that he gave no warnings whatsoever to Mrs. Menefee, and that her testimony that she had received no warnings should be given conclusive effect. Although the jury might have inferred from Dr. Guehring's deposition testimony, considered alone, that he had given no warnings whatsoever to Mrs. Menefee, it had other testimony from Dr. Guehring which would support a conclusion that he had given adequate warning to Mrs. Menefee. Dr. Guehring stated that he had warned Mrs. Menefee about excessive drowsiness in the child, that he told her to look for any increased or decreased activity, and that he informed her of the possibility of a rash developing. The record reflects that the testimony merely contained some contradictions and inconsistencies which were for the jury to resolve. *Robinson v. Ashner*, 364 S.W.2d 223 (Tex.1963). There was testimony which, if believed by the jury, sufficiently supported the doctor's position that he advised Mrs. Menefee of some of the symptoms which might develop as a result of the drug therapy.

The burden was upon the plaintiffs to offer evidence and to obtain an affirmative finding on the issue of informed consent. In order to do this, the plaintiffs were required to prove by expert medical evidence what a reasonable medical practitioner in the field of pediatrics would have disclosed to the patient's parents regarding the risks incident to the prescribed drug therapy. *Wilson v. Scott*, 412 S.W.2d 299, 302 (Tex.1967).

We hold that the record does not support the plaintiff's contention that, as a matter of law, they met this burden, and we also find, from our review of the entire record, that the jury's failure to make an affirmative finding on the issue was not so manifestly against the great weight and preponderance of the evidence as to require that we reverse the judgment and order a new trial. We accordingly overrule plaintiff's points of error one, sixteen and seventeen.

■ We next consider plaintiff's points of error relating to the court's charge. The trial court submitted the following special issues and instruction regarding the issue of informed consent:

*Special Issue No. 6*

Do you find from a preponderance of the evidence that the Defendant, Dr. James T. Guehring, failed to obtain the informed consent of John D. Menefee's mother for the treatment of him with the drug Phenobarbital?

Answer "We do" or "We do not."

Answer: *We do not*

By the term "informed consent" as used herein is meant the furnishing by the doctor to the patient's mother of reasonable information in regard to the patient's condition and of the risks involved in the use of the drug Phenobarbital in the treatment of the patient's condition, to enable the mother to make a decision in regard to the patient taking Phenobarbital.

If you have answered Special Issue No. 6 "We do," and only in that event then answer:

*Special Issue No. 7*

Do you find from a preponderance of the evidence that such failure to obtain informed consent, if any found by you in answer to Special Issue No. 6, was a proximate cause of injury and damages to Plaintiffs?

Answer "We do" or "We do not."

Answer: _____

The plaintiffs argue that the trial court erred in refusing their requested issues on informed consent which, they contend, correctly submitted the question both as to (1) the initial treatment and (2) the continued treatment after the development of the reaction to the drug. Plaintiffs also assert that the court's instruction is incorrect because it assumes a contested fact, *i.e.*, that the drug, Phenobarbital, was appropriate

to treat the patient's condition. We overrule these complaints and the plaintiffs' related arguments pertaining to their requested instruction and their objections to the court's charge. All of the *medical* testimony concerning the issue of informed consent related to Dr. Guehring's initial prescription of the drug, and the trial court did not abuse its discretion in refusing to give the plaintiffs' requested special issues inquiring whether the plaintiff's informed consent was obtained as to the continued treatment with the drug. That the court's charge may incidentally have commented on the weight of the evidence, by assuming that the prescription of Phenobarbital was an appropriate means of treatment, does not render the instruction improper. Tex. R.Civ.P. 277.

We hold, therefore, that the court's charge on informed consent, and the instruction given in connection therewith, fairly presented the issue to the jury and that the court did not abuse its discretion in refusing to submit the plaintiffs' requested issues and in overruling the plaintiffs' exception to the instruction given by the court. Accordingly, we overrule the plaintiffs' second, third and fifteenth points of error. We also overrule the plaintiffs' fourteenth point of error in which they complain that the trial court abused its discretion in predicating the proximate cause issue on an affirmative answer to the informed consent issue. Rule 277, *supra; Johnson v. Whitehurst*, 652 S.W.2d 441 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.)

We next reach the plaintiffs' points of error relating to their theory that Dr. Guehring was negligent in initially prescribing the drug Phenobarbital. First, we consider their points six through nine, contending that the trial court abused its discretion in refusing their requested issue and in overruling their exceptions to the court's charge on the doctor's alleged negligence in his initial prescription of the drug; that the court abused its discretion in overruling their motion for new trial on the ground that negligence was shown as a matter of law; and that the jury's failure to find such negligence was manifestly against the great weight and preponderance of the evidence.

The court's first five special issues submitted to the jury were as follows:

### Special Issue No. 1

Do you find from a preponderance of the evidence that John D. Menefee sustained a reaction from the drug Phenobarbital?

Answer "We do" or "We do not."

Answer: We do

If you have answered Special Issue No. 1 "We do," and only in that event, then answer:

### Special Issue No. 2

Do you find from a preponderance of the evidence that Defendant, Dr. James T. Guehring, was negligent in commencing treatment of John D. Menefee with the drug Phenobarbital when he did commence such treatment?

Answer "We do" or "We do not."

Answer: We do not

If you have answered Special Issue No. 2 "We do," and only in that event, then answer:

### Special Issue No. 3

Do you find from a preponderance of the evidence that such negligence, if any found by you in answer to Special Issue No. 2, was a proximate cause of injury and damages to Plaintiffs?

Answer "We do" or "We do not."

Answer: _____

If you have answered Special Issue No. 1 "We do," and only in that event, then answer:

### Special Issue No. 4

Do you find from a preponderance of the evidence that Defendant, Dr. James T. Guehring, was negligent in continuing treatment of John D. Menefee with the drug Phenobarbital for the period of time that he did continue such treatment?

Answer "We do" or "We do not."

Answer: We do not

If you have answered Special Issue No. 4 "We do," and only in that event, then answer:

### Special Issue No. 5

Do you find from a preponderance of the evidence that such negligence, if any found by you in answer to Special Issue No. 4, was a proximate cause of injury and damages to Plaintiffs?

Answer "We do" or "We do not."

Answer: _____

■ Dr. Guehring testified that he had prescribed Phenobarbital in order to provide a safeguard against further epileptic-like episodes which he felt were suggestive of a seizure disorder. There was no medical testimony from which it might be inferred that the initial prescription of Phenobarbital was a departure from accepted medical standards. We hold that the evidence did not establish negligence on the part of Dr. Guehring as a matter of law, and based on our review of the entire record, we find that the jury's failure to find in favor of the plaintiffs on such issue is not against the overwhelming great weight and preponderance of the evidence. We overrule plaintiffs' seventh and eighth points of error.

■ We also hold that the trial court did not abuse its discretion in refusing the plaintiffs' requested issues asking the jury to determine whether Dr. Guehring had failed to exercise ordinary care in prescribing Phenobarbital when the minor plaintiff was discharged from the hospital on July 9, 1974. There was no evidence whatsoever that Dr. Guehring prescribed any medication for the patient on his discharge from the hospital on July 9, 1974 and, if for no other reason, the trial court properly refused the issue on that ground.

■ The plaintiffs' objections to Special Issue No. 2 complain of the failure of that issue as submitted to inquire whether Phenobarbital was negligently administered because the hospital tests did not indicate the existence of any disorder warranting the use of an anti-seizure drug. Because those tests occurred well after the initial prescription of the drug, the trial court did not abuse its discretion in overruling the plaintiffs' exceptions based upon that premise. We overrule the plaintiffs' sixth and ninth points of error.

■ We move to a consideration of the plaintiffs' third theory, that the doctor was negligent in continuing the drug treatment of the minor patient "for the period of time that he did continue such treatment." In their tenth and eleventh points of error, the plaintiffs contend that the trial court abused its discretion in overruling their exceptions to Special Issue No. 4. Plaintiffs argue that the wording of that issue was confusing because it failed to inquire whether the doctor was negligent in the use of the drug "under the facts in the case," and whether the doctor knew, or in the exercise of ordinary care should have known, of the adverse reaction necessitating the termination of the drug. Plaintiffs also contend that it was an abuse of discretion for the court to predicate Issue No. 5 on an affirmative finding to Issue No. 4, arguing the evidence was undisputed that the plaintiff suffered a reaction to the drug. In their twelfth and thirteenth points of error, the plaintiffs contend that Dr. Guehring's negligence in continuing treatment was established, as a matter of law, and that the jury's failure to render an affirmative finding to Special Issue No. 4 is against the great weight and preponderance of the evidence.

None of the physicians who testified stated that Dr. Guehring should have stopped the drug therapy any sooner than he did or that the continuance of the drug therapy was contrary to established medical standards. We hold that the negligence issue submitted in Special Issue No. 2 was not established as a matter of law, and we find, from our review of the entire record, that the jury's failure to render an affirmative answer to the issue was not against the great weight and preponderance of the evidence. These points of error are overruled.

Plaintiffs' fourth point alleges that the court abused its discretion in refusing to give an issue to the jury on negligence in failing to terminate the Phenobarbital treatment at an earlier time. Since this is just a rephrasing of the issue submitted on negligence in continuing treatment, there was no error in refusing the issue.

Finally, plaintiffs in their fifth point allege the court below erred in refusing an issue on Dr. Tengg's negligence in failing to diagnose the child's reaction at the time the child's mother telephoned for advice. The court could have properly determined that this particular issue was sufficiently addressed in its broad issue on negligence in continuing treatment. We therefore overrule plaintiff's fifth point of error.

The judgment of the trial court is affirmed.